UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MARIE WALTER,

                              Plaintiff,

            vs                                    1:05-CV-01167

MARY BOEHM; CINDY HASKINS; DINEEN
RIVIEZZO; MICHAEL BOXER; OFFICE OF
THE NEW YORK STATE INSPECTOR
GENERAL; and THE STATE OF NEW YORK,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

COOPER ERVING & SAVAGE, LLP                PHILLIP G. STECK, ESQ.
Attorneys for Plaintiff                    BRIAN W. MATULA, ESQ.
4th Floor                                  SHARALYN SAVIN, ESQ.
39 North Pearl Street
Albany, New York 12207

HON. ANDREW M. CUOMO                       JANICE A. DEAN, ESQ.
Attorney General of the                    NANCY G. GROENWEGEN, ESQ.
   State of New York                       Asst. Attorneys General
Attorney for Defendants
Department of Law
The Capitol
Albany, New York 12224

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

        Plaintiff Marie Walter ("Walter" or "plaintiff") brings this action against Mary Boehm

("Boehm"), Cindy Haskins ("Haskins"), Dineen Riviezzo ("Riviezzo"), Michael Boxer ("Boxer"),

the Office of the New York State Inspector General ("OIG"), and the State of New York.

Walter asserts two claims.  First, under 42 U.S.C. § 1983 ("§ 1983"), she alleges that her First and Fourteenth Amendment rights were violated when defendants terminated her employment in retaliation for engaging in speech that is protected by the United States Constitution.  Second, Walter alleges that her rights under § 201-d of the New York State Labor Law, which protects employees from discrimination based on political activities, were violated when defendants terminated her employment.

Defendants moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Plaintiff opposed.  Oral argument was heard on January 3, 2007, by video motion in Utica and Albany, New York.  Decision was reserved.

## II. FACTS

The following facts are undisputed unless otherwise noted.[1]

Walter was employed as a senior investigator with the OIG.  Defendants Boehm, Haskins, Riviezzo, and Boxer all work in the OIG.  At the time relevant to the complaint, defendants held the following positions:  Boehm was Chief Deputy to the Inspector General; Haskins was Director of Administration for the Inspector General; Riviezzo was Inspector General; and Boxer was First Executive Deputy to the Inspector General.  The OIG is a department of the Executive Branch of the State of New York.  The Inspector General, Riviezzo, reports to and serves at the pleasure of the Governor.

In March 2005, Riviezzo was privately approached by the Governor's Office and was told that the Governor intended to appoint her to the Inspector General position.  In May

---

[1] Walter denies the relevant outcomes of most of the meetings and conversations that she was not a party to.  She additionally denies that Riviezzo reached any mental conclusions, regarding the necessity to terminate plaintiff and others, prior to the date she was terminated.  However, the documented proof speaks for itself.

2005, Riviezzo was told by the Counsel to the Governor that she would be appointed as Inspector General in or about early June 2005, after she returned from her two week vacation.

On May 17, 2005, Riviezzo met with Boxer and Dennis Martin ("Martin") to discuss her upcoming appointment and her office restructuring plan. Riviezzo and Martin took notes. (See Docket No. 16-7 at 33-34 (Riviezzo's notes reflecting the decision to terminate Walter); Docket No. 16-7 at 35-36 (Martin's notes reflecting the decision to terminate Walter).) At this meeting, they identified seven employees for termination, including Walter. They discussed moving Walter to a position in Intake,[2] but Riviezzo did not want to move her to Intake so they decided to terminate plaintiff.[3] Riviezzo testified that, "at the end of the meeting [her] instructions were that Marie Walter, Ann Palillo, Patty Patterson, Mark Slagen, Jean Walsh and Fran Fullerton were going to be terminated." (Docket No. 16-1 at 36.) These individuals were being targeted for termination because they added the least amount of value to the office and, in order to restructure the office, Riviezzo needed to make a certain number of position lines and a certain amount of money available in the budget. Id. at 44. Riviezzo instructed Martin and Boxer to begin implementing the terminations and other organizational changes while she was on vacation, before she was officially appointed as Inspector General. Id. at 46.

---

[2] As indicated by "Intake" written by next to Walter's name. (Plaintiff's exhibit 11.)

[3] As indicated by the circle around Walter's name on Riviezzo's sheet (Plaintiff's exhibit 10) and the box around her name on Martin's sheet (Plaintiff's exhibit 11). Earlier in the meeting, Riviezzo indicated those employees that were not considered for termination by marking a dash next to their name; Walter does not have a dash next to her name. (Plaintiff's exhibit 10.)

The next day, May 18, 2005, Boxer met with Haskins and asked her to meet with staff in the Division of the Budget regarding the OIG's proposed terminations and salary revisions. That day, Haskins met with Division of the Budget staff members Susan Oligny ("Oligny") and Joan Hope ("Hope"). Oligny took notes at the meeting that reflected the decision to terminate Walter. (See Docket No. 16-18 at 1; Docket No. 16-19 at 1.)

Boxer sent an e-mail to OIG staff on May 23, 2005, entitled "Office Reorganization." (See Docket No. 16-7 at 32.) The e-mail made the staff aware of possible salary adjustments and terminations within their department. Id. Walter received this e-mail and understood that the reorganization could effect her personally.

During the week of June 6, 2005, employees of the OIG received an interoffice e-mail informing them that a Deputy Inspector General in the Buffalo Office, Joseph Giglio, was selected to fill a vacant Assembly seat for the Buffalo area.

On or about June 8, 2005, plaintiff was asked by Boehm if she would be interested in attending a political fund-raiser for Mr. Giglio. The fund-raising event was to be held on June 21, 2005, at the Albany Pump Station and the cost of attending was seventy-five dollars. Plaintiff replied that she did not think it was appropriate for a supervisor to solicit political donations from a subordinate on State time and property; she particularly stressed this in the case of the OIG. Boehm said that Haskins was organizing the fund-raising event and that she had asked Boehm to solicit people to attend. Boehm testified that she asked Walter if she wanted to attend the fund-raising event because she knew plaintiff was a friend of Mr. Giglio's and she did not want plaintiff to feel left out. Later that day, one of Walter's co-workers told Boehm that plaintiff was uncomfortable with the discussion that had occurred between them.

On June 10, 2005, Boehm called plaintiff into her office to discuss her concerns regarding plaintiff's objection to a supervisor soliciting political donations from a subordinate on State time and property.  Boehm again indicated that Haskins was organizing the fund-raising event.  On or about the same day, Riviezzo returned from her 2 week vacation and was appointed to the Inspector General position.  Martin told Riviezzo that they did not move forward with the terminations because, when Boxer spoke with Haskins, Haskins told him that people did not need to be terminated in order for the OIG to hire additional people.

On June 13, 2005, Riviezzo began to interview people for management and auditor positions that would be created as a result of the OIG restructuring plan.  As she began making offers, Riviezzo wanted to make sure that she had enough funds and position lines available to make the offers without terminating any of the existing staff.  On June 14, 2005, Riviezzo addressed the OIG staff and told them that terminations would not be necessary. However, on June 17, 2005, Riviezzo asked Martin to have Haskins fax her information on the department budget and position lines available after the recent offers.  (See Docket No. 16-7 at 47-50.)  The fax showed that, with the new hires, the OIG was running a deficit of $36,000 and had exceeded the number of available position lines by two.  Id.  Riviezzo testified that this information convinced her that she would need to return to the original termination plan that they had developed on May, 17, 2005.  Additionally, Riviezzo withdrew an offer she had already made to one candidate.

Riviezzo testified that, though she was already convinced that she would have to move forward with the terminations, she spent the following week convincing her staff that the terminations were necessary.  On June 20, 2005, Haskins faxed Riviezzo a memorandum that stated that she believed the OIG could use money from the nonpersonal

service budget and transfer it into the personal service budget in order to avoid terminating existing employees. (See Docket No. 16-7 at 51-52.) Haskins gave Riviezzo another document on the following day that reflected one-time budget savings that would allow them to avoid terminating any existing employees. (See Docket No. 16-7 at 55-56.) Riviezzo reviewed the documents, but felt that Haskin's proposal was not a responsible way to manage a budget. Martin suggested that she meet with Budget Examiner Timothy Eskeli ("Eskeli") in the Division of the Budget and Riviezzo agreed to do so.

On June 21, 2005, Riviezzo made a written list of four employees to be terminated, including the plaintiff. That evening, the political fund-raising event was held as planned. Walter did not attend. Boxer, Riviezzo, Haskins, and others employed by the OIG attended.

On June 22, 2005, Riviezzo met with Eskeli regarding the OIG's budget after the proposed restructuring. She took notes at the meeting that reflected a potential budgetary shortfall of $2.8 billion in the New York State budget and a directive to each department to withhold 2.5 percent of General Fund monies. (See Docket No. 16-7 at 53-54.) On the same day, Riviezzo and Boxer learned that Walter was telling other employees that they had violated the Hatch Act by attending the fund-raising event. Riviezzo testified that this conversation "took 30 seconds and that was the end of it," there was no decrease in the efficiency of the office or interruption to the workplace. (Docket No. 16-3 at 29.)

Walter never complained regarding Boehm's political solicitation to either Boxer or Riviezzo. According to defendants, neither Boxer nor Riviezzo knew that Boehm had approached Walter until this lawsuit was filed.

The day after her June 22, 2005, meeting with Eskeli, Riviezzo met with Boxer, Haskins, and other senior staff in order to finalize the terminations. Haskins was told to

process the termination paperwork for Walter and three other OIG employees.  Later that day, plaintiff's employment was terminated.  Defendants did not announce the termination to her.  Rather, Joseph Flynn ("Flynn"), Walter's direct supervisor, announced her termination.  Plaintiff alleges that Flynn did not have the authority to terminate her employment, only defendants had the authority to do so.  Plaintiff was told that she was terminated due to "restructuring" in the OIG.  (Docket No. 1, 4.)

Walter alleges that there were a number of positions remaining, or were subsequently created, in the OIG that she could have filled.  Before she was terminated, plaintiff had been rated an "effective" performer.  Id.  Prior to her termination, she was not given any reason to believe that her employment would be terminated.

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Richardson v. N.Y. State Dep't of Corr. Servs., 180 F.3d 426, 436 (2d Cir. 1999); Lang v. Retirement Living Pub. Co., 949 F.2d 576, 580 (2d Cir. 1991).  The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990).  Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986); Richardson, 180 F.3d at 436; Project Release v. Prevost, 722 F.2d 960, 968 (2d Cir. 1983).

When the moving party has met the burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356.  At that point, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56; Liberty Lobby, Inc., 477 U.S. at 250, 106 S. Ct. at 2511; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.  A plaintiff "cannot defeat summary judgment on a retaliation claim merely by impugning [a defendant's] honesty."  McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 280 (2d Cir. 1999).  To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.  Liberty Lobby, Inc., 477 U.S. at 248-49, 106 S. Ct. at 2510; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.

Moreover, material facts set forth in the movant's statement required by the local rules are deemed admitted unless controverted in the nonmovant's statement in opposition. L.R. 7.1(a)(3).  Thus, no genuine issue exists as to facts set forth in a movant's 7.1 Statement if the nonmovant fails to put such facts into controversy by a response in opposition to the summary judgment motion.  See id.

## IV.  DISCUSSION

### A.  Section 1983 Claim

Defendants move for summary judgment on Walter's § 1983 claim on the grounds that:  (1) the complaint fails to state a First Amendment claim of retaliation; (2) she fails to allege personal involvement by Boxer, Boehm, and Haskins in any alleged constitutional violation; (3) and the Eleventh Amendment bars the claim against the State of New York and

the OIG.[4]  Section 1983 gives private citizens the right to sue the government for

constitutional violations.  Id.

      **1.  First Amendment Free Speech Retaliation Claim**

      **a.  Standard of Review**

The First Amendment provides:  "Congress shall make no law . . . abridging the

freedom of speech . . . ."  U.S. Const. amend. I.  Determining whether speech is protected by

the First Amendment is a question of law.  Connick v. Meyers, 461 U.S. 138 n. 7, 150, 103 S.

Ct. 1684 n. 7, 1692 (1983) (citing Pennekamp v. Florida, 328, U.S. 331, 335, 66 S. Ct. 1029,

1031 (1946)).

A government employer may not take adverse actions against a public employee in

retaliation for speech that is a matter of public concern and is protected by the First

Amendment.  Connick, 461 U.S. at 140, 103 S. Ct. at 1686.  However, a government's ability

to regulate speech as an employer "differ[s] significantly from those it possesses in

connection with regulation of the speech of the citizenry in general."[5]  Pickering v. Bd. of

Educ., 391 U.S. 563, 568, 88 S. Ct. 1731, 1734 (1968).  In order to make a First Amendment

retaliation claim, a plaintiff must demonstrate the following by a preponderance of the

evidence:  "(1) his speech was constitutionally protected; (2) he suffered an adverse

employment decision; and (3) a causal connection exists between his speech and the

---

[4]  Walter asserted this cause of action under both the First and Fourteenth Amendments.
However, the Fourteenth Amendment was included only insofar as it makes the First Amendment
applicable to the State of New York and the OIG.

[5]  Given the wide range of scenarios in which statements by public employees may be grounds
for dismissal or other adverse employment action, the Supreme Court has declined to "lay down a
general standard against which all such statements may be judged."  Pickering, 391 U.S. at 569, 88 S.
Ct. at 1731.

adverse employment determination against him, so that it can be said that his speech was a

motivating factor in the determination." Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)

(citing Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283-87, 97 S. Ct.

568, 574-76 (1977)).

### i. Protected Speech

The First Amendment gives government employees a "limited right . . . to speak on

matters of public concern." Sheppard v. Beerman, 317 F.3d 351, 355 (2d Cir. 2003) (citing

Connick, 461 U.S. at 140, 103 S. Ct. at 1686).  Because this right is limited, to establish the

first element, that the speech was constitutionally protected, a plaintiff must establish the

following sub-elements:  (1) that their speech can be "fairly characterized as constituting

speech on a matter of public concern"; and (2) that "the value of the speech" as a matter of

public concern outweighs its "potential to disrupt the employer's operations."  Harris v.

Merwin, 901 F. Supp. 509, 511-12 (N.D.N.Y. 1995) (citations omitted).  Generally, speech is

considered of public concern and protected by the First Amendment when it addresses "any

matter of political, social, or other concern to the community."  Connick, 461 U.S. at 146, 103

S. Ct. at 1684.  To determine whether, as a matter of law, the speech is a matter of public

concern, its "content, form and context" must be examined by taking the entire record into

consideration.  Id. at 147-48, 103 S. Ct. at 1690.

In order to determine whether the value of the speech outweighs its potential to

disrupt the employer's operations, the court must balance the "interests of the [employee], as

a citizen, in commenting upon matters of public concern and the interest of the State, as an

employer, in promoting the efficiency of the public services it performs through its

employees."  Pickering, 391 U.S. at 568, 88 S. Ct. at 1734.  Specifically, the government

employer must show that the speech interfered with "the effective and efficient fulfillment of its responsibilities to the public." Connick, 461 U.S. at 150, 103 S. Ct. at 1692; Frank v. Relin, 1 F.3d 1317, 1329 (2d Cir. 1993).

### ii. Adverse Employment Action

The second element is satisfied if a plaintiff can prove that they suffered "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, [or] reprimand." Morris, 196 F.3d at 110 (citing Kaluczky v. City of White Plains, 57 F.3d 202, 208 (2d Cir. 1995)).  The Second Circuit has also suggested that lesser actions may also be considered adverse employment actions.  See Bernheim v. Litt, 79 F.3d 318, 327 (2d Cir. 1996).

### iii. Causal Connection

To satisfy the third element, a plaintiff must establish that "the speech was a substantial or motivating factor behind the discharge" or adverse employment action.  Harris, 901 F. Supp. at 512.  The causal connection between a plaintiff's speech and the adverse employment action may be inferred.  Morris, 196 F.3d at 110 (citing Mount Healthy City Sch. Dist. Bd. of Educ., 429 U.S. at 287, 97 S. Ct. at 576).

### b. Discussion

### i. Walter's Protected Speech

To determine whether, as a matter of law, Walter's speech is protected, the substance of her speech must be examined by taking the entire record into consideration. See Connick, 461 U.S. at 147-48, 103 S. Ct. at 1690.  The speech plaintiff engaged in, and she alleges is protected by the First Amendment, was that on two occasions she told Boehm that she did not think it was appropriate for a supervisor to solicit political donations from a

subordinate on State time and property and she particularly stressed this in the case of the OIG.

Thereafter, she participated in discussions with co-OIG employees regarding the appropriateness of soliciting OIG employees to attend the fund-raising event.  She also told co-workers that they would be violating the Hatch act by attending the fund-raising event. After  the fund-raising event was held as planned and plaintiff did not attend, she told co-workers they had violated the Hatch act.  Plaintiff makes no claim that these discussions with co-employees are protected speech.

Since Walter is a government employee, the First Amendment protects only her limited right to speak on matters of public concern without adverse employment action.  See Sheppard, 317 F.3d at 355 (citing Connick, 461 U.S. at 140, 103 S. Ct. at 1686).  Viewing the facts in the light most favorable to plaintiff, Walter's speech to Boehm, her superior, objecting to political solicitations, is speech on a matter of public concern because it addresses a possible violation of a State statute and/or ethics requirements by government employees, a topic of political concern to the community.  See Connick, 461 U.S. at 146, 103 S. Ct. at 1690.  While Walter's subsequent discussions with her co-workers regarding the appropriateness of soliciting OIG employees to attend the fund-raising event and her opinion that they were violating the Hatch act by attending the fund-raising event occurred on State time and property had the potential to disrupt the OIG they, in fact, did not.  Therefore such concerns do not outweigh the value of her speech.  See Harris, 901 F. Supp. at 511-12. Accordingly, Walter's speech to Boehm on June 8 and 10, 2005, is protected by the First Amendment.

### ii. **Adverse Employment Action Against Walter**

Walter suffered an adverse employment action when she was terminated from the

OIG on June 23, 2005.  See Morris, 196 F.3d at 110 (citing Kaluczky, 57 F.3d at 208).

### iii. **Causal Connection**

Even if a causal connection between Walter's protected speech and her termination

may be inferred, she still must demonstrate that her speech "was a substantial or motivating

factor behind the discharge."  Harris, 901 F. Supp. at 512; see Morris, 196 F.3d at 110 (citing

Mount Healthy City Sch. Dist. Bd. of Educ., 429 U.S. at 287, 97 S. Ct. at 576).  To defeat a

motion for summary judgment, Walter "must set forth specific facts showing that there is a

genuine issue for trial."  Fed. R. Civ. P. 56; Liberty Lobby, Inc., 477 U.S. at 250, 106 S. Ct. at

2511; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.  She does not do so.

Walter's initial discussion with Boehm regarding the impropriety of a supervisor

soliciting political donations from a subordinate on State time and property, particularly in the

case of the OIG, occurred on June 8, 2005.  On June 10, 2005, plaintiff and Boehm had a

another discussion regarding Walter's objections, but no adverse employment action is

alleged to have occurred until her termination two weeks later.  No additional communication

is alleged to have occurred between plaintiff and defendants regarding her objections to her

political solicitation. Further, plaintiff has offered no direct evidence that Riviezzo knew of her

objections to the solicitation.  (Walter Dep., Docket No. 16-8 at 34-38.)  The basis for

Walter's belief that she was terminated in retaliation for her protected speech is the timing of

her termination, two days after the fund-raising event took place and one day after Riviezzo

was informed of her Hatch Act discussions with co-employees.  Id. at 37-38.  However, when

plaintiff was terminated on June 23, 2005, she was told that she was terminated due to "restructuring." (Docket No. 1, 4.)

Although plaintiff was terminated two days after the fund-raising event, the termination was two weeks after the protected speech with Boehm. Therefore, the timing of her termination alone is not sufficient to warrant an inference that her protected speech "was a substantial or motivating factor behind the discharge." Harris, 901 F. Supp. at 512; see Morris, 196 F.3d at 110 (citing Mount Healthy City Sch. Dist. Bd. of Educ., 429 U.S. at 287, 97 S. Ct. at 576). This is particularly true in view of other uncontradicted evidence that the initial decision to terminate plaintiff and others was made over three weeks in advance of Walter's protected speech, the speech which she maintains caused her termination. Since the initial decision to terminate was made in advance of her protected speech, she has not established the required causal connection because "[t]here can be no causal link where the alleged adverse action predated the protected activity." Barry v. Town of Elma, No. 02-CV-344, 2005 WL 711842, at *4 (W.D.N.Y. March 28, 2005).

The sum of the evidence presented is as follows: (1) May 17, 2005--Riviezzo, Boxer, and Martin met and identified Walter and others for termination (see Docket No. 16-7 at 33-34 (Riviezzo's notes reflecting the decision to terminate Walter); Docket No. 16-7 at 35-36 (Martin's notes reflecting the decision to terminate Walter)); (2) May 18, 2005--Boxer spoke with Haskins and asked her to speak with officers in the Division of the Budget regarding the proposed terminations and salary revisions, Haskins then met with Division of the Budget staff members Oligny and Hope, and Oligny took notes that reflected the decision to terminate Walter (see Docket No. 16-18 at 1 (Oligny's notes from her meeting with Haskins); Docket No. 16-19 at 1 (a roster of employees in the OIG marked by Oligny on May

18, 2005)); (3) <u>May 23, 2005</u>--Walter received a department-wide e-mail from Boxer regarding the OIG restructuring and potential terminations (<u>see</u> Docket No. 16-7 at 32); (4) <u>June 8, 2005</u>--Boehm approached Walter regarding the political fund-raising event and Walter objected (protected speech); (5) <u>June 10, 2005</u>--Boehm spoke with Walter regarding her concerns about being solicited by Boehm while at work (protected speech); (6) <u>between June 8 and June 22</u>--Walter discussed the solicitation, the fund-raiser, and the Hatch Act with co-employees; (7) <u>between June 10, 2005, and June 21, 2005</u>--several meetings took place regarding whether the proposed terminations were necessary (<u>see</u> Docket No. 16-7 at 47-50 (fax from Haskins to Martin regarding the proposed terminations); Docket No. 16-7 at 55-56 (document given by Haskins to Riviezzo, on June 21, 2005, reflecting one-time budget savings and the proposed terminations)); (8) <u>June 14, 2005</u>--Riviezzo addressed the OIG staff and advised them that terminations would not be necessary for reorganization; (9) <u>June 17, 2005</u>--Riviezzo decided terminations would be necessary; (10) <u>June 21, 2005</u>--Walter and three other employees were placed on a termination list (Ex. 14 Riviezzo Dep.); the fund-raising event took place as scheduled, Walter did not attend but Boxer, Riviezzo, Haskins, and other employees of the OIG attended; (11) <u>June 22, 2005</u>--Riviezzo met with Budget Examiner Eskeli regarding the OIG budget after the proposed restructuring (<u>see</u> Docket No. 16-7 at 53-54 (Riviezzo's notes from her meeting with Eskeli, reflecting potential budgetary shortfall and directive to withhold funds)); Riviezzo and Boxer learned of Walter's discussions with other employees regarding attendance at the political fund-raiser and the Hatch Act; and (12) <u>June 23, 2005</u>--Riviezzo met with Boxer, Haskins, and other senior staff in order to finalize the terminations; Haskins was told to process the paperwork; Flynn was told to terminate Walter due to restructuring, requests to terminate <u>three other OIG</u>

employees were processed; and Flynn terminated Walter and told her it was due to restructuring within the OIG.

As demonstrated by the sum of evidence set forth above, in addition to their sworn testimony, defendants have produced physical evidence that substantiates their claim that Walter's termination was not related to her protected speech with Boehm. Rather, defendants show that on May 17, 2005, they identified plaintiff for termination and the plaintiff's initial protected speech with Boehm did not take place until June 8, 2005. Although the actual termination took place two days after the fund-raising event, and one day after Riviezzo was informed of plaintiff's non-protected speech, plaintiff was identified for termination well in advance of her protected speech. She was placed on a list for termination (with three other employees) before Riviezzo even learned about plaintiff's non-protected speech with co-employees.

In addition, there is little or no evidence that the decision maker, Riviezzo, knew of plaintiff's protected speech at the time of termination. Of course, if she had no knowledge of the protected speech it could not have played a part in her decision to terminate Walter. In that regard, plaintiff attempts to co-mingle two separate events--her protected speech (i.e., objections to being solicited by her superior for a political fund-raiser) and her non-protected speech (i.e., later discussions with co-employees about attendance at the fund-raiser and the Hatch Act). Riviezzo and Boxer admit knowledge of the latter events. There is no direct evidence that either had knowledge of the former event. Plaintiff's only argument is that knowledge of the latter equals knowledge of the former. Apparently she wishes to imply that because Riviezzo knew about her Hatch Act discussions she must also have known about her political solicitation objections. Even if this implication was true (which is doubtful) such a

thin reed of circumstantial evidence is insufficient to raise a question of fact for a jury that Riviezzo knew of plaintiff's objections to her being solicited by Boehm and that this information was a substantial or motivating factor in the decision to terminate her.

Although summary judgment is not appropriate when there are questions of fact regarding the employer's motive; the record demonstrates that Walter's protected speech did not play a part in Riviezzo's decision to terminate her. See Morris, 196 F.3d at 110. She was treated the same as the three other terminated employees.

While Walter satisfies the first two elements of a First Amendment claim of retaliation, even viewing the facts in the light most favorable to plaintiff, she is not able to show that a sufficient causal connection exists between her protected speech and her termination.

Therefore, defendants' motion for summary judgment, with respect to Walter's § 1983 claim, will be granted.

### 2. Eleventh Amendment Bar on § 1983 Claim Against the State

The Eleventh Amendment provides that, "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. A state is immune from suits in federal court that are brought by its citizens, unless that state consents. See Edelman v. Jordan, 415 U.S. 651, 662-63, 94 S. Ct. 1347, 1355 (1974); McGinty v. New York, 251 F.3d 84, 91 (2d Cir. 2001). Additionally, "state agencies acting under its control" enjoy the protection of Eleventh Amendment immunity. P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144, 113 S. Ct. 684, 687-88 (1993). The OIG has been recognized as an entity that is

entitled to Eleventh Amendment immunity.  <u>Cf.</u> <u>Hall v. Ruggeri</u>, 841 F. Supp. 484, 486 (N.D.N.Y. 1994) (granting a motion to dismiss claims against the OIG and other state entities based on their Eleventh Amendment immunity).

Defendants' motion for summary judgment with respect to Walter's § 1983 claim will be granted.  However, defendants' motion could be granted on alternate grounds, with respect to the claim against the State of New York and the OIG, because the Eleventh Amendment provides immunity from suits in federal court that are brought by its citizens. <u>See</u> <u>Edelman</u>, 415 U.S. at 662-63, 94 S. Ct. at 1355; <u>McGinty</u>, 251 F.3d at 91.

Therefore, defendants' motion for summary judgment, with respect to the § 1983 claim against the State of New York and the OIG, will be granted, on this additional ground.

### B. <u>Pendent State Law Claim</u>

Defendants argue both that the complaint fails to state a claim under State Labor Law and that the supplemental state claim should be dismissed.

Supplemental jurisdiction may be exercised over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Supplemental jurisdiction permits the adjudication of federal and state law claims together if they are between the same parties and they "derive from a common nucleus of operative fact or are of such a nature that the parties would normally be expected to try them in one judicial proceeding." <u>Federman v. Empire Fire & Marine Ins. Co.</u>, 597 F.2d 798, 808 (2d Cir. 1979) (citing <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 725, 86 S. Ct. 1130, 1138 (1966)).  If the district court has dismissed all the claims over which it has original jurisdiction, the district court may decline to extend supplemental jurisdiction over the state law claims.  <u>Id</u>. at 809.

Because the § 1983 cause of action will be dismissed, it is appropriate to decline supplemental jurisdiction over the state law claim.

## IV.  **CONCLUSION**

Walter satisfies the first two elements of a First Amendment claim of retaliation. However, even viewing the facts in the light most favorable to her, she is not able to show a causal connection between her protected speech and her termination.  The evidence in favor of the plaintiff fails to demonstrate that her protected speech with Boehm regarding political solicitation on State time and property by a superior to a subordinate was a substantial or motivating factor in her termination.  Accordingly, defendants' motion for summary judgment with respect to plaintiff's § 1983 claim must be granted.

Defendants alternatively move for summary judgment, with respect to the claims against Boehm, Haskins, and Boxer on the grounds that plaintiff has alleged no personal involvement by them in her termination.  Because defendants' motion for summary judgment will be granted with respect to the § 1983 claim, this issue need not be reached.  Though defendants' motion for summary judgment with respect to the § 1983 claim will be granted, the § 1983 claim against the State of New York and the OIG must also be dismissed on the additional ground that they have Eleventh Amendment immunity.

Supplemental jurisdiction over the state law claim will be declined.

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment with respect to the § 1983 claim is GRANTED;

2. The federal § 1983claim is DISMISSED; and

3. The state law claim is DISMISSED without prejudice.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  August 15, 2007
        Utica, New York.